IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

LAWRENCE CAMPBELL                                                PLAINTIFF

V.                                              CAUSE NO. 1:12CV405-LG-JMR

ATLANTIC SCAFFOLDING COMPANY,
LLC; ATLANTIC INDUSTRIAL, INC.;
BROCK GROUP                                                     DEFENDANTS

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is the [22] Motion for Summary Judgment filed by

Defendant Atlantic Scaffolding Company, LLC ("Atlantic"). Plaintiff Lawrence

Campbell alleges claims of racial discrimination and retaliation pursuant to Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as well as claims of

infliction of emotional distress and punitive damages, against Atlantic. Lawrence

has responded in opposition to Atlantic's Motion for Summary Judgment, and

Atlantic has filed a reply. Having reviewed the parties' briefs, the evidence in the

record, and the applicable law, it is the opinion of the Court that Atlantic is entitled

to summary judgment on Campbell's Title VII failure to promote and

discriminatory discharge claims, as well as his claim of infliction of emotional

distress and his claim for punitive damages. However, Atlantic is not entitled to

summary judgment on Campbell's Title VII retaliation claim. Accordingly,

Atlantic's Motion for Summary Judgment is granted in part and denied in part.

BACKGROUND

Atlantic Scaffolding Company performs work as a subcontractor at the

Chevron refinery in Pascagoula, Mississippi.  During the time period relevant to this litigation, Atlantic divided its work at Chevron into several projects, or divisions: Routine Maintenance Projects, Turnaround Projects, and Large Capital Projects.  Atlantic also performed what is referred to as Small Capital Projects.  As will be discussed in more detail below, the parties dispute whether the Small Capital Projects work was a separate division, or whether it was considered to be within one of the other divisions.

Generally, each division was headed by a Project Manager who oversaw the various Atlantic employees who staffed it.  The Project Managers reported directly to the Site Manager, who oversaw all of Atlantic's work at the Chevron refinery, and was the highest-level Atlantic employee based there.  During the relevant time period, there was no Project Manager designated for Small Capital Projects.  Rather, the small capital work and employees were managed by a General Foreman.  A General Foreman was a level below Project Manager in Atlantic's management hierarchy.

Plaintiff Campbell worked for Atlantic during the period from 2006 to early 2011.  Campbell started as a lead builder and was promoted multiple times.  In late 2007, Campbell was promoted to General Foreman over Small Capital Projects, and served in that capacity until he was terminated in 2011.  (Pl. Mem. 1, ECF No. 33; Pl. Resp. Ex. A, Campbell Aff. 1-2 (¶3), ECF No. 32-1).  Campbell claims in this lawsuit that he sought a promotion to Project Manager, but was denied.  Campbell is African-American.  He submits that during the relevant period, all of Atlantic's

2

other Project Managers were white.

*Management of Atlantic's Small Capital Projects*

In the statement of facts in his complaint, Campbell claims that as General Foreman over Small Capital Projects, he had the same level of responsibility as the Project Managers, and was acknowledged by Atlantic employees to be the Project Manager, but he was not given the "title, pay, or benefits" of Project Manager. (Compl. 3, ECF No. 1).  Campbell also asserts that as the General Foreman over Small Capital Projects, he reported directly to the Site Manager, similarly to the other Project Managers.  Campbell submits that beginning in late 2007, he made Atlantic management aware that he "was qualified and wanted the Project Manager position for Small Cap and/or Large Cap or any other project manager position that would be available." (*Id.* at 2).  According to Campbell, he inquired about the promotion to Project Manager multiple times over the course of the next several years.

Atlantic disputes that Small Capital Projects was an independent division, and asserts that the small capital work fell under the Routine Maintenance Projects Division.  Atlantic has submitted affidavits of two of its managers, Chris Romano and Chris Scruggs, who explain that Small Capital Projects work "was managed and supervised by a General Foreman, who was to report to the Routine Maintenance Projects superintendent." (Romano Aff. 2, ECF No. 22-1; *see also* Scruggs Aff. 2, ECF No. 22-3; Def. Mem. 3, ECF No. 23).  Therefore, according to Atlantic, when Campbell was promoted to General Foreman over Small Capital

3

Projects, "his work fell under the immediate supervision of the project manager for the Routine Maintenance Projects Division." (Def. Mem. 3, ECF No. 23; Romano Aff. 3, ECF No. 22-1). During the relevant time period, the Project Manager over Routine Maintenance was Johnny Baxter. Atlantic submits that "Campbell had a history of not getting along well with . . . Baxter," and to resolve that conflict, Campbell "was often permitted to bypass the Project Manager and report directly to the Site Manager instead." (Romano Aff. 3, ECF No. 22-1; Scruggs Aff. 2, ECF No. 22-3). However, Atlantic argues, "the Routine Maintenance Projects Manager was still ultimately responsible for the small capital project work." (Def. Mem. 4, ECF No. 23; Romano Aff. 4, ECF No. 22-1; Scruggs Aff. 2, ECF No. 22-3).

In response to the Motion for Summary Judgment, Campbell claims that as the General Foreman for Small Capital Projects, he "did not report to Baxter." (Pl. Mem. 2, ECF No. 33). He attests that he "reported directly and daily to the Site Manager," and that he "was never told by any of [his] superiors that [he] was working for and should report to . . . the project manager for Routine Maintenance." (Campbell Aff. 3, ECF No. 32-1). Campbell asserts that "[s]mall capital division did not fall under routine maintenance, but was a separate division." (*Id.*) Campbell testified in his deposition that he handled a number of duties that were considered to be a Project Manager's responsibility. (Campbell Dep. 53:9–55:8, ECF No. 22-2).

In support of its Motion, Atlantic submits that "Chevron dictates to Atlantic the work that must be completed, and is responsible for determining what positions are necessary to staff the work. Chevron also determines the hourly rate it will pay

4

Atlantic for each position." (Romano Aff. 2, ECF No. 22-1; Scruggs Aff. 1, ECF No. 22-3; Def. Mem. 2, ECF No. 23). According to the affidavit of Chris Scruggs, Site Manager, Chevron is "specific, dictating what position should be supervising each project and how many foremen, general foremen, and other employees can be assigned to each project." (Scruggs Aff. 1-2, ECF No. 22-3). Atlantic maintains that "[t]here was not sufficient responsibility in Campbell's position as General Foreman over small capital projects to merit Atlantic's making a special request of Chevron to allow a Project Manager position to oversee the small capital projects." (Def. Mem. at 4, ECF No. 23; Romano Aff. at 4, ECF No. 22-1).

Atlantic argues that "the work that fell under Campbell's supervision was significantly less involved and generally required fewer employees than the work handled by Project Managers," and that "small capital projects handled by Atlantic were much smaller in scope, duration, and complexity" than the other divisions. (Def. Mem. 4, ECF No. 23; Romano Aff. 2, 4, ECF No. 22-1).[1]

*Available Project Manager Positions*

Atlantic submits that during the period that Campbell was serving as General Foreman over Small Capital Projects, one Project Manager position became

_____

[1] Atlantic has submitted "head count" documents that show the number of employees who worked on each project each day, and it argues that Small Capital Projects consistently required fewer employees than the other projects. (Def. Mot. Ex. 5, ECF No. 22-5). The Court also notes that Campbell admitted in his deposition that the Large Capital and Turnaround projects could be staffed with as many as one hundred (100) or more employees, while the maximum number of employees Small Capital may have had was fifty (50) or sixty (60) for a large project. (Campbell Dep. 45:1-16, ECF No. 22-2).

available in 2008.  (Def. Mem. 5, ECF No. 23).  That position was filled by Scott

Scruggs.  (*Id.*; Romano Aff. 4, ECF No. 22-1)  Atlantic asserts that it "experiences

little turnover in its Project Manager positions, and no other Project Manager

positions were open during Campbell's tenure as general foreman."  (*Id.*)

  In contrast, Campbell asserts in his response to Atlantic's Motion that "there

were several occasions that a project manager's position became vacant" while

Campbell was serving as General Foreman.  (Pl. Mem. 4, ECF No. 33).  Campbell

claims that the Project Manager for Large Capital Projects position became

available "when Jarman Cochran left the company," and that a white employee was

promoted into that position "in late 2009 or early 2010."  (*Id.*; Campbell Aff. 11,

ECF No. 32-1).  Campbell attests in his affidavit that he inquired about that

position, but Chris Scruggs told him that he would stay over Small Capital Projects.

(Campbell Aff. at 4).

  Campbell also testified in his deposition that when he started in Small

Capital Projects, he "knew that the large cap position was open and the small cap

position was starting to come open."  (Campbell Dep. 44:8-11, ECF No. 22-2).

Campbell testified that "Jarman Cochran moved from the turnaround manager

position to the large capital [Project Manager] position," and that Scott Scruggs

became Project Manager over Turnaround Projects when Cochran moved to Large

Capital.  (*Id.* at 44:15-18; 45:17-23).

  *Campbell's Account of Racial Issues at Atlantic and Denial of Promotion*

  In Campbell's account of the facts, the denial of his promotion and his

6

termination were connected to several racially-charged events that occurred during his employment with Atlantic.  Campbell's factual account is set forth in the affidavit he submitted in response to the Motion for Summary Judgment.  Campbell claims that in late 2007, Chris Romano told Campbell that he would be promoted to Project Manager over Small Capital Projects after Atlantic acquired the remainder of the available small capital work at the Chevron refinery.  (Campbell Aff. 2, ECF No. 32-1).

Campbell submits that Atlantic acquired all of Chevron's small capital work in late 2008, while he was serving as General Foreman.  He also attests that around that time, in late 2008 or early 2009, he received a racist text message from Chris Scruggs, Atlantic's newly-appointed Site Manager.  (Campbell Aff. 3, ECF No. 32-1).  Campbell reported the text message to Chris Romano, who was then in upper management at Atlantic, as well as Atlantic's Human Resources department. Campbell claims that after reporting this incident, he "was never promoted since." (*Id.*)  Campbell states that shortly thereafter, in early 2009, he inquired about his promotion to Project Manager, but Romano told him that "he would get back with [him] after . . . [the] investigation into the racial text."  (*Id.* at 4).  Campbell asserts that after speaking with Romano, he felt his promotion was at stake, so he sent an e-mail to human resources stating that issue about the text message was resolved.[2] (*Id.*)

---

[2] As Atlantic points out, Campbell did not mention the 2008 text message in either his Complaint or his EEOC charges.

7

Campbell also focuses a substantial portion of his affidavit on his involvement in litigation filed by a group of Atlantic employees in 2009, referred to herein as "the *Gibson* litigation."[3]  Campbell asserts that in 2009, Chris Scruggs and Chris Romano gave him a list of employees, all of whom were minorities, and told him to lay off those employees.  Campbell attests that Scruggs told Campbell that Atlantic needed a "black project manager" to inform the employees about the layoffs "due to all the race issues Atlantic was having at Chevron."  (Campbell Aff. 4, ECF No. 32-1).  Campbell states that he did not show up for work the following day, so Romano executed the layoffs.  (*Id.*)  Campbell has also testified that sometime thereafter, when those employees were filing a lawsuit against Atlantic, Romano and Scruggs asked him to provide a statement against the employees, and they told him that "it all depends on your help.  You know you're wanting that project manager position."  (Campbell Dep. 92:10–93:3, ECF No. 22-2).

Campbell was deposed in the *Gibson* litigation in the summer of 2010.  He asserts that before his deposition, Atlantic management pressured Campbell to testify that he had laid off the employees, instead of Romano.  (Campbell Aff. 5, ECF No. 32-1).  Campbell was never asked about the layoffs during his deposition, but afterward, he resisted signing a declaration when Atlantic's counsel asked him

---

[3] The case was *Gibson, et al. v. Atlantic Scaffolding Co.*, Civil Action No. 1:09CV725-LG-RHW.  The record reflects that the case settled in 2011.

to do so.[4]  (*Id.* at 5-6).  Campbell states in his affidavit that he approached Chris

Scruggs about the declaration in early December 2010, and Scruggs told Campbell

that he should "play ball to win" and "not give the lawyer a hard time."  (Campbell

Aff. 6, ECF No. 32-1).  At that point, Campbell signed the declaration.  (*Id.*)

Campbell submits that several weeks later, in mid-January 2011, he contacted the

attorneys who represented Atlantic in the *Gibson* litigation "to inform them that

[he] wanted to clarify [his] deposition," because he "may have committed perjury

and/or that [he] wasn't being truthful about everything."[5]  (*Id.*)  Campbell testified

that after he did so, Chris Scruggs told him "you know you're making a big mistake.

You're about to get this promotion."  (Campbell Dep. 93:19–94:1, ECF No. 22-2).

     Campbell attests that on January 19, 2011, he asked Chris Scruggs about his

promotion, and Scruggs told him it was being denied.  (*Id.*)  On that same date,

Campbell filed a charge with the EEOC.  Shortly after he filed his first EEOC

charge, Campbell complained to Atlantic's Human Resources director about racial

discrimination in its promotion and demotion practices.  (Compl. 3, ECF No. 1; *see

also* Motley Dep. 15:6–16:13, 36:4-12).  Andrea Motley, the Human Resources

director, testified that she opened an investigation into Campbell's complaint on or

---

     [4] However, Campbell does not explain in his affidavit why he resisted signing
the declaration, or what it contained that he found objectionable.

     [5] However, Campbell states that when Atlantic's attorney contacted him to
set up a meeting, Campbell was not comfortable talking with her and ended the
call.  (Campbell Aff. 7, ECF No. 32-1).  It is not clear from Campbell's affidavit what
portion of his deposition he felt had been untruthful.  The record in this action does
not contain Campbell's testimony in the *Gibson* litigation.

about January 20, 2011.  (Motley Dep. 17:23–18:2).

*Campbell's Suspension and Termination*

Campbell asserts that, around the same time his promotion was denied, in mid-January 2011, "several minority employees of Atlantic" asked for his "help in informing Chevron about racial discrimination and improper dealing" by Atlantic supervisors.  (Campbell Aff. 7, ECF No. 32-1).  Campbell states that he told the employees to report the issues to the Chevron hotline.  On January 26, 2011, a Chevron Security representative contacted an Atlantic manager and requested a meeting with Campbell.  (Def. Mot. Ex. 10, Cooper e-mail, ECF No. 22-10).  According to Campbell, he gave the Chevron Security employee a statement about wrongdoing by Atlantic.  (Campbell Aff. 7).

The following day, January 27, 2011, Campbell received a written reprimand and was suspended without pay because he had participated "in a fraud investigation being conducted by [Chevron]."  (Compl. 3, ECF No. 1).  Chris Scruggs attests in his affidavit that it was his understanding that Campbell had "made an allegation to Chevron without first reporting to Atlantic Scaffolding, which is a violation of company policy."  (Scruggs Aff. 3, ECF No. 22-3). Atlantic has submitted the written reprimand, or disciplinary form, it issued to Campbell as an exhibit to its Motion for Summary Judgment.  The form notes that Campbell was suspended for "Insubordination/Refusal to Perform" and "Failure to Comply with Company

10

Policy." (Mot. Ex. 11, Disciplinary Action Form, ECF No. 22-11).[6]

Campbell was permitted to make a handwritten statement on the disciplinary action form, in which he states that the reprimand was "a retaliatory act" by Atlantic "for reporting racial discrimination at the Chevron site." (Mot. Ex. 11, Disciplinary Action Form, 2, ECF No. 22-11). Campbell further asserted that the reprimand was an attempt to fire him for "hiring an attorney to tell the truth" in the *Gibson* litigation. (*Id.*) Campbell immediately informed the Human Resources director of his reprimand and suspension, and later that day Atlantic rescinded the reprimand and informed him that his suspension would be with pay, instead of without pay. (Compl. 3, ECF No. 1; Campbell Aff. 8-9, ECF No. 32-1).

According to the record, Chris Romano contacted Campbell that same day and requested to meet him that evening. According to Campbell, he met Romano at a restaurant, where Romano asked him, "what's it gonna take?," apparently in reference to Campbell's attempt to change his testimony in the *Gibson* litigation (Campbell Aff. 9 (¶38), ECF No. 32-1). Campbell asserts that Romano offered Campbell a position in Atlantic's Mobile, Alabama office, but Campbell refused. (*Id.* at 10).

Atlantic has a very different account of the meeting between Romano and Campbell on the evening of January 27, 2011. According to Romano, he met with

---

[6] The form does not explain what "alleged violation" Campbell had reported to Chevron, and the record is not entirely clear as to what wrongdoing Chevron was investigating.

Campbell to discuss his return to work following his suspension, and "his report of potential perjury in his prior deposition testimony." (Romano Aff. 5, ECF No. 22-1). In Romano's notes about the meeting, he states that Campbell told Romano that he could not work for Chris Scruggs because he would "always be looking over his shoulder," and that Atlantic employees were "a bunch of racist [expletive]s," and that he complained specifically that two black employees had recently been demoted while white employees had been promoted. (Def. Mot. Ex. 14 at 1, Romano e-mail, ECF No. 22-14). Campbell then told Romano that if Atlantic made him "an offer he couldn't refuse, he would make all of this go away." (*Id.*)

According to Romano, he asked Campbell what he was talking about, and Campbell "said money," and "the pending lawsuit . . . the complaints to [human resources] and the situation with Chevron Security." (Def. Mot. Ex. 14 at 1, ECF No. 22-14). Romano states that Campbell said that "he would make it all go away and he would disappear . . . and would make everything right with Chevron and the 'black guys' in his crew." (*Id.*) According to Romano, he told Campbell that he was "not in a position to offer him anything," that "for anyone to give him a payout would seem like a cover up," and that the "company . . . wanted . . . him to tell the truth." (*Id.*) Campbell has denied that he asked Romano to pay him to make the racial discrimination complaints go away. (Campbell Dep. 77:21-25, ECF No. 22-2).

On February 2, 2011, Atlantic terminated Campbell, citing as its basis his attempted extortion of the company. (Compl. 3, ECF No. 1; (Campbell Dep. 68:19-24, Def. Mot. Ex. 2, ECF No. 22-2). Campbell's separation notice states that he was

12

discharged for "[u]nethical conduct in requesting the Company to 'make me an offer I can't refuse' and 'I can make everything go away,' specifically referring to the pending lawsuit with 'the dolls at Chevron.'" (Def. Mot. Ex. 15, Separation Notice, ECF No. 22-15).  The day after he was terminated, Campbell filed another charge of discrimination with the EEOC.  Atlantic submits that after Campbell was terminated, it placed "a black employee [] in the position of General Foreman assigned to Small Capital Projects."  (Scruggs Aff. 3, ECF No. 22-3).

*Campbell's EEOC Charges*

As noted above, Campbell filed a charge of discrimination with the EEOC on January 19, 2011, in which he alleged that he had been denied a promotion to Project Manager because of his race.  (ECF No. 22-7) (hereinafter "first EEOC charge").  Campbell's first EEOC charge stated:

> I have been denied a promotion to Project Manager.  I believe I have not been promoted because of my race.  The Respondent has multiple Divisions and all have Project Managers except for my Division.  I am the General Foreman in charge of the Small Capitol Division.  I am acknowledged by employees and other managers as the Project Manager, however, I don't have the title, pay or benefits.  All of the Respondent's Project Managers for other Divisions are White.  I have the same level of responsibility and supervise more employees than some divisions.

(*Id.*)  The first EEOC charge lists the earliest dates the discrimination took place as July 21, 2010, and the latest on January 19, 2011 (the date he was informed his promotion was denied).  (*Id.*)

Campbell filed a second charge of discrimination with the EEOC on February

13

3, 2011, in which he alleged that he was retaliated against by Atlantic for his complaints about discrimination.  (Compl. Ex. 2 at 3, ECF No. 1-2).  His charge states that he believes he was "reprimanded, suspended, and terminated because of [his] race (Black) and because [he] complained of race discrimination." (*Id.*) Campbell referenced his first EEOC charge, as well as his complaint to Atlantic's Human Resources director about racial issues on January 22, 2011.

On September 28, 2012, and November 15, 2012, the EEOC notified Campbell of his right to file a lawsuit based on his second and first charges, respectively, in federal or state court within ninety (90) days.  (ECF No. 1-2, ECF No. 1-3)

*Campbell's Complaint*

Campbell timely filed this action in December 2012, and his complaint states claims of race discrimination pursuant to Title VII, retaliation pursuant to Title VII, punitive damages, and infliction of emotional distress under state law.  (Compl. 4-5 (¶¶13-21), ECF No. 1).  The complaint does not specify which of the alleged facts give rise to Campbell's claim of racial discrimination, as opposed to his retaliation claim.  However, it appears that the general theory underlying Campbell's claims is that he complained about racial issues to Atlantic and Chevron, and as a result, he was not promoted and eventually terminated.

DISCUSSION

Atlantic moves for summary judgment on all of Campbell's claims.  Atlantic argues: (i) Campbell's failure to promote claim is time-barred; (ii) even if the failure

14

to promote claim is not time-barred, Campbell has failed to state a prima facie case of Title VII discrimination; (iii) Campbell has failed to state a prima facie case of retaliation; and (iv) his emotional distress and punitive damages claims are without merit.

## I.  Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 940 (5th Cir. 2005).  As the movant, Atlantic bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If Atlantic carries this burden, the burden shifts to Campbell to show that summary judgment should not be granted. *Celotex Corp.*, 477 U.S. at 324-25.  Campbell may not rest upon mere allegations or denials in his pleadings but must set forth specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## II.  Title VII Failure to Promote Claim

Atlantic asserts that Campbell's failure to promote claim is time-barred by the 180-day statute of limitations under Title VII.  Campbell filed his EEOC charge on January 19, 2011.  Therefore, Atlantic argues, Campbell must demonstrate that

he was denied a promotion due to racial discrimination, or that his cause of action accrued, during the 180-day period prior to January 19, 2011.  Atlantic asserts that "Campbell was not denied any promotion during the actionable time frame."  (Def. Mem. 12, ECF No. 23).  Atlantic points out that Campbell has testified that the only Project Manager position that became available during his tenure with Atlantic was filled in 2008, which was well outside of the 180-day period.

Campbell responds that his claim is not time-barred because as late as January 2011, the Site Manager "assured Campbell that he was about to get [the] promotion . . . to project manager of Small Capital Projects."  (Pl. Mem. 8, ECF No. 33).  As set forth above, Campbell stated in his affidavit, and testified in his deposition, that he spoke with Chris Romano and Chris Scruggs about the promotion just before he filed his EEOC charge.  Campbell testified that when he contacted Atlantic's counsel in mid-January 2011 about his deposition testimony in the *Gibson* case, Chris Scruggs "told me, you know, you're making a big mistake. You're about to get this promotion." (Campbell Dep. 93:23--94:1, ECF No. 32-2). Neither Chris Romano nor Chris Scruggs address in their affidavits whether Campbell approached them about a promotion to Project Manager for Small Capital Projects, or whether Campbell was led to believe he would receive such a promotion at any time.[7]

_____

[7] However, Campbell has submitted a memo from Chris Scruggs to Human Resources director Andrea Motley, in which Scruggs responded to a question about whether Campbell formally request that a Project Manager position be created for Small Capital Projects.  Scruggs states: "Don't remember if Randy ever ask[ed]

Campbell further argues that even though he did not submit a formal, written application for a promotion during the 180-day period, he is not barred from raising a failure to promote claim. He asserts that it "was well accepted by those with authority" at Atlantic that "an oral communication to the right person . . . could result in an employee being promoted." (Pl. Mem. 8-9, ECF No. 33). However, Campbell does not point to any examples of promotions that were given on this basis.

At the summary judgment stage, the Court must first determine whether Campbell has stated a prima facie case of discrimination based on a failure to promote. The Court applies the familiar *McDonnell Douglas* analysis, under which Campbell must show that: (1) he belongs to a protected class; (2) he was qualified for position; (3) despite his qualifications, he was rejected; and (4) after his rejection, the position remained open and his employer continued to seek applicants from persons of his qualifications. *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 324 (5th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1060 (5th Cir. 1998)).

---

about a PM [Project Manager] position being available for Small cap. Didn't ask me! If he would have inquired, my answer would have been that Chevron will not pay for a PM position without the required headcount and structure that would allow it." (Pl. Resp. Ex. E 3, ECF No. 32-5). In the same correspondence, Scruggs stated that Small Capital Projects was never assigned a Project Manager because it "never had the headcount" or "structure that was required for a project manager," and it was "a small crew that usually operated under the routine group with a General foreman. This was a collective decision on Chevron's part to lower the over head cost in the refinery by managing multiple crews." (*Id.*)

17

If Campbell establishes a prima facie case, the burden shifts to Atlantic to articulate a legitimate, nondiscriminatory reason for its decision not to promote Campbell.  If Atlantic articulates such a reason, Campbell must show that Atlantic discriminated against him, and may do so by demonstrating that Atlantic's articulated reason is merely a pretext for discrimination.  *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *McDonnell Douglas*, 411 U.S. at 802).

   *A. Failure to Promote -  Small Capital Projects Manager Position*

   Campbell does not dispute that there was never a Project Manager position designated for Small Capital Projects.  Atlantic submits that Small Capital Projects continues to be supervised by a General Foreman, not a Project Manager, and Campbell has not disputed this assertion.  Thus, Campbell has failed to show a prima facie case of discrimination based on a failure to promote, because he cannot demonstrate that "the position remained open," and Atlantic continued to seek applicants for the position.

   Moreover, even if Campbell was able to make out a prima facie case, there is another problem with his failure to promote claim.  Campbell alleges that he was performing duties similar to a Project Manager, but all of his claims in this lawsuit are based on his allegation that he was always classified as a General Foreman.  Thus, in order for Campbell to have been promoted to a Project Manager position over Small Capital Projects, that position would have been newly-designated.  Atlantic has submitted evidence that Chevron, and not Atlantic's management, "is

18

responsible for determining what positions are necessary to staff the work," and more specifically, what position should supervise each project. (Romano Aff. 2 (¶4), ECF No. 22-1; Scruggs Aff. 1-2 (¶3), ECF No. 22-3). Campbell has not contradicted this evidence, or put forth any evidence that Atlantic managers had the authority to create a Project Manager position over Small Capital Projects.

According to Campbell's deposition testimony, Chevron employee John Buckley was the small capital team leader for Chevron while Campbell was handling Atlantic's Small Capital Projects. Buckley handled Chevron's small capital work refinery-wide, and was responsible for awarding projects to subcontractor companies such as Atlantic. (Campbell Dep. 40:1-17, ECF No. 32-2). Notably, Campbell admits in his affidavit that John Buckley "would be the one to determine if he wanted a Project Manager over his project at the Chevron Pascagoula Site." (Campbell Aff. 10 (¶41), ECF No. 32-1). The record does not contain any testimony from Buckley or other Chevron employees.

Atlantic's evidence that it was *Chevron's* decision, not Atlantic's, to designate a Project Manager, rather than a General Foreman, to oversee Small Capital projects remains undisputed. Given that there was no Project Manager position over Small Capital Projects, Campbell cannot demonstrate that Atlantic denied him a promotion to a position that did not exist. "The nonexistence of an available position is a legitimate reason not to promote." *Perez*, 307 F.3d at 325 (affirming summary judgment in favor of employer where employer presented evidence that it did not promote plaintiff or reclassify his position because the management position

19

he sought was never approved for funding, and therefore the position did not exist, and plaintiff did not prove that employer's stated reason was false) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n. 44 (1977).  Campbell has not presented evidence to disprove Atlantic's legitimate, nondiscriminatory justification for the failure to promote Campbell to Project Manager over Small Capital Projects. Accordingly, Atlantic is entitled to summary judgment on this claim.

   *B.  Failure to Promote - Other Project Manager Positions*

   Campbell has alleged that he indicated an interest in *any* available Project Manager positions after he was promoted to General Foreman.  Atlantic maintains that only one such position became available during the relevant time period, and that position was filled by Scott Scruggs in 2008.  (Romano Aff. 4, ECF No. 22-1). Campbell does not dispute that Scott Scruggs was appointed to Project Manager over Turnaround Projects in 2008; he testified that Scruggs filled that position when Jarman Cochran moved to Large Capital Projects. (Campbell Dep. 44:8-18, 45:17-23, ECF No. 22-2).

   It is not entirely clear from the record whether the Project Manager positions filled by Scott Scruggs or Jarman Cochran were open for applications at the time Campbell expressed interest in becoming a Project Manager, but in any event, there is no evidence that Campbell applied for either of those positions.  More significantly, Campbell is time-barred from claiming that he was denied a promotion to those positions in violation of Title VII.  Campbell filed his charge with the EEOC alleging that he was denied a promotion in January 2011, so any

decisions made in 2008 are beyond the 180-day limitations period in 42 U.S.C. §
2000e-5(e)(1).[8]  *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th
Cir. 2001) ("An employee who claims to be the victim of a racially motivated failure
to promote . . . . is put on notice that his rights have been violated at the time the
adverse employment decision occurs, and must therefore bring the claim within 180
days of the adverse decision").  Accordingly, Campbell's failure to promote claims
with respect to the positions filled by Scott Scruggs and Jarman Cochran are time-
barred.

Finally, Campbell argues in response to Atlantic's Motion that there were
"several" Project Manager vacancies during his tenure as General Foreman for
Small Capital Projects.  (Pl. Mem. 4, ECF No. 33).  His brief only mentions one,
however.  Campbell asserts that when Jarman Cochran left the company, the Large
Capital Projects Manager position became available, and a "white employee" was
promoted into that position "in late 2009 or early 2010."  (*Id.*; Campbell Aff. 11,
ECF No. 32-1).  Campbell attests in his affidavit that he inquired verbally about
that position, but he has not submitted any additional evidence about when that
particular Project Manager position was available, or who was hired to fill it.
Regardless, given that the position was filled "in late 2009 or early 2010," any claim
that Campbell was denied a promotion to that position is also time-barred by the

_____

[8] That section provides in part: "A charge under this section shall be filed
within one hundred and eighty days after the alleged unlawful employment practice
occurred[.]"  42 U.S.C. § 2000e-5(1).

180-day limitations period.  There is no evidence that any other Project Manager position became available after Campbell expressed his interest in a promotion to that position, or that he applied for any other such positions.  Accordingly, Atlantic is entitled to summary judgment on Campbell's claims regarding the other Project Manager positions.

### III.  Title VII Termination Claim

Campbell alleges that Atlantic terminated him because of his race in violation of Title VII.  The parties agree that the Court should apply the framework set forth in *McDonnell Douglas*, 411 U.S. 792, to Campbell's Title VII discriminatory discharge claim.  Therefore, if Campbell succeeds in showing a prima facie case, Atlantic must provide a legitimate, non-discriminatory reason for its decision, and then Campbell must demonstrate that the proffered reason was mere pretext for discrimination.  *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000).

To establish a prima facie case, Campbell must establish: (1) that he is a member of a protected group; (2) that he was qualified for the position held; (3) that he was discharged from the position; and (4) that he was replaced by someone outside of the protected group, or was treated less favorably than other similarly situated employees outside the protected group.  *Willis v. Cleco Corp.*, 749 F.3d 314, 320 (5th Cir. 2014) (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  Under the fourth element's "similarly situated employees" requirement, "a plaintiff must show that he was treated less favorably than others 'under nearly

identical circumstances.'" *Id.* (quoting *Love v. Kan. City S. Ry.*, 574 F.3d 253, 259-60 (5th Cir. 2009)).

Campbell is an African American and a member of a protected racial group; there is no dispute that he was qualified for the position of General Foreman over Small Capital Projects; and there is no dispute that he was discharged or terminated from his position. Thus, Campbell has met the first three elements of a prima facie case. However, with respect to the fourth element, Atlantic has submitted evidence that Clinton Riley, a black employee, replaced Campbell after he was terminated. (Scruggs Aff. 3 (¶13), ECF No. 22-3). Campbell has not disputed this evidence, or put forth evidence that he was replaced by someone outside of the protected group.[9] He has not identified any other employees who were treated more favorably than he was under similar circumstances. Thus, Campbell has failed to establish all elements of a prima facie case of discriminatory discharge under Title VII.

Campbell argues that, under Fifth Circuit precedent, he does not necessarily have to show that he was replaced by an individual who is outside the protected group to make out a prima facie case of discrimination. Campbell cites *Williams v. Trader Publ'g Co.*, 218 F.3d 481 (5th Cir. 2000), in which the United States Court of Appeals for the Fifth Circuit affirmed a jury's finding of gender discrimination

---

[9] When asked at his deposition about Mr. Riley, Campbell stated that he has stayed in touch with Mr. Riley since he was terminated, but he did not know what position Mr. Riley currently held with Atlantic. (Campbell Dep. 99:20–100:9, ECF No. 32-2).

where the plaintiff, a woman, had been terminated from her employment and she did not show that she was replaced by a male employee. The Fifth Circuit declined to reverse the jury's finding, holding that the plaintiff had not necessarily failed to establish a prima facie case of discriminatory discharge where she had not shown that she was replaced by a male employee. *Williams*, 218 F.3d at 485.

The *Williams* court relied on *Hornsby v. Conoco, Inc.*, 777 F.2d 243 (5th Cir. 1985), noting that "although replacement with a non-member of the protected class is evidence of discriminatory intent, it is not essential to the establishment of a *prima facie* case under Title VII." *Id.* (citing *Hornsby*, 777 F.2d at 246). In *Hornsby*, the district court dismissed the plaintiff's sex discrimination claim for failing to establish a prima facie case where the plaintiff's position was filled by someone within the protected class (in that case, another woman). 777 F.2d at 246. The Fifth Circuit held that the district court's dismissal of her claim for that reason was erroneous, but nevertheless affirmed the district court's dismissal "because Hornsby failed to offer any evidence other than her subjective belief . . . that she was terminated because of her sex." *Id.* at 247.

The controlling case law in this circuit appears to be that "the single fact that a plaintiff is replaced by someone within the protected class does not negate the possibility that the discharge was motivated [by] discriminatory reasons." *Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997) (citing *Hornsby*, 777 F.2d at 246-47) (additional citations omitted). "While not outcome determinative, this fact

is certainly material to the question of discriminatory intent."  *Nieto*, 108 F.3d at

624; *see also Byers*, 209 F.3d at 426-427 (discussing *Hornsby* and *Nieto*, holding that

plaintiff had not made out a prima facie case where he was replaced by another

individual in the same protected class, and did not present evidence beyond his

belief that he was terminated based on his race).  Thus, like the *Hornsby* and *Byers*

courts, this Court must examine whether Campbell has presented any evidence

other than his subjective belief that he was terminated because of his race.

Campbell's only argument in response to Atlantic's Motion for Summary

Judgment on this particular claim is that "[a] reasonable jury can and probably will

infer that race was a motivating factor in terminating Campbell" because he

"testified in his deposition that Chris Scruggs had previously texted a racist joke . . .

and Campbell turned him in to the human resources department."  (Pl. Mem. 12-13,

ECF No. 33).  Campbell's assertion that he complained about Scruggs's racist text

message would be more appropriately made in support of his retaliation claim,

rather than as evidence of discriminatory discharge.  Chris Scruggs has submitted

an affidavit in which he attests that he did not make the decision to terminate

Campbell, which Campbell has not disputed.  (Scruggs Aff. 3 (¶12), ECF No. 22-3).

Campbell has not presented any evidence with respect to who made the decision to

terminate him, and it does not appear from the record that he took any depositions

in an attempt to discover that information.[10]

_____

[10] It does not appear that Campbell took any depositions during the course of
discovery.  The record indicates that he served one set of interrogatories and one set

Campbell makes no further arguments, and presents no evidence, with respect to his claim that Atlantic terminated him because of his race.  The Fifth Circuit has held that a plaintiff's subjective belief that he was discharged because of racial discrimination, unsupported by other factual evidence, is insufficient to establish termination based on race.  *Hornsby*, 777 F.2d at 247; *Byers,* 209 F.3d at 427 (5th Cir. 2000).  *See also Banks v. AT&T Wireless, Inc.*, 113 Fed. App'x 614 (5th Cir. 2004) (unpublished) ("An employee's subjective belief of discrimination alone is not sufficient to warrant judicial relief") (citing *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001); *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999); *EEOC v. LA. Office of Cmty. Servs.*, 47 F.3d 1438, 1448 (5th Cir. 1995)).  Moreover, Campbell has not presented any direct or circumstantial evidence that race was even a motivating factor in Atlantic's decision to terminate him.  Nor has he attempted to demonstrate that he was treated less favorably than other similarly situated employees outside of his protected group.

Campbell focuses his allegations and arguments on facts that support his retaliation claim, which is separate and distinct from a racial discrimination claim.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) (explaining that the antidiscriminatory provision of Title VII "seeks to prevent injury to individuals based on who they are, i.e., their status[,] while the "antiretaliation provision seeks to prevent harm to individuals based on what they do, i.e., their

---

of requests for production of documents.  *See* ECF No. 29.

conduct"). Given the lack of evidence in support of his discriminatory discharge

claim, combined with Campbell's failure to satisfy the fourth element of his prima

facie case, the Court finds that summary judgment appropriate on this claim.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986) (plaintiff may not rest

upon conclusory allegations but must set forth specific facts showing the existence

of a genuine issue for trial).

       *Pay Discrimination Claim*

       Finally, Atlantic has argued that Campbell has also failed to state a claim of

pay discrimination under Title VII. It is not clear from Campbell's complaint

whether he intended to state a claim of pay discrimination apart from his failure to

promote claim, but Campbell has not made any arguments at the summary

judgment stage regarding a pay discrimination claim. Nor has he pointed to any

evidence that would support such a claim in response to Atlantic's Motion for

Summary Judgment. Accordingly, there is no need to address Atlantic's

substantive arguments about this claim. To the extent a pay discrimination claim

was stated in the complaint, it is deemed abandoned and therefore dismissed. *See*

*Willis*, 749 F.3d at 317 ("Rule 56 does not impose upon the district court . . . a duty

to sift through the record in search of evidence to support a party's opposition to

summary judgment") (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th

Cir. 1998)); *Scales v. Slater*, 181 F.3d 703, 708 n. 5 (5th Cir. 1999) (noting that the

plaintiff abandoned her disparate impact claim in district court when she neither

contested defendant's arguments for dismissal of that claim nor demonstrated that her statistical evidence demonstrated pretext).

## IV.  Title VII Retaliation Claim

Atlantic moves for summary judgment on Campbell's Title VII retaliation claim on the grounds that Campbell has failed to state a prima facie case of retaliation.  To present a prima facie case of retaliation under either Title VII, Campbell must show that: (1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action.  *Willis*, 749 F.3d at 317-18 (citing *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).  Under the burden-shifting framework of *McDonnell Douglas*, 411 U.S. 792, (1973), once Campbell presents a prima facie case, the burden shifts to Atlantic to "proffer a legitimate rationale for the underlying employment action."  749 F.3d at 318 (quoting *Davis*, 383 F.3d at 319).  If Atlantic offers such a reason, the burden shifts back to Campbell to demonstrate that Atlantic's articulated reason was a pretext for retaliation.  *Id.*  The Supreme Court recently made clear in *University of Texas Southwestern Medical Center v. Nassar* that a plaintiff must establish that his protected activity was a but-for cause of the employer's adverse action.  133 S.Ct. 2517, 2533 (2013).[11]

---

[11] *But see Ramirez v. Bausch & Lomb, Inc.*, No. 12–14679, —— F. App'x ——, slip op. at 3 n.2 (11th Cir. 2013) ("However, the Court did not clarify the role of 'but for' causation in a plaintiff's prima facie case.").

Campbell's complaint alleges that he was retaliated against when he was several protected activities for which Atlantic retaliated against him, which include "voicing his desire and intent to clarify his prior deposition testimony in" the *Gibson* case, his January 2011 complaint to Human Resources "about black employees being demoted," and his January 19, 2011 EEOC charge.  (Pl. Mem. 13, ECF No. 33).

There appears to be no dispute that Campbell has met the first two prima facie elements with respect to his termination.  Campbell engaged in protected activity, and his termination amounts to an adverse employment action.  Whether Campbell has satisfied the third element is a matter of dispute.  Atlantic argues that Campbell has failed to show "'but-for' causation between his complaints and his termination."  (Def. Mem. 22, ECF No. 23).

Campbell argues in response to Atlantic's Motion for Summary Judgment that, while he does not have direct evidence of retaliation, he "has sufficient circumstantial evidence to support his claims of retaliation."  (Pl. Mem. 13, ECF No. 33).  His entire argument that his retaliation claim should survive summary judgment is that, because Atlantic terminated him "so close to the time" that he filed his EEOC charge and complained to Human Resources about the demotions, "a reasonable jury can conclude that but-for Campbell's protected activity, [Atlantic] would not have terminated [him], especially if that same reasonable jury disbelieved Defendant's assertion that Campbell tried to extort [Atlantic]."  (Pl. Mem. 13-14, ECF No. 33).

The Court finds that, viewing the evidence in the light most favorable to Campbell, there is a question of fact as to whether there is a causal link between Campbell's protected activity and his termination.

First, there was a series of events that occurred in very close temporal proximity to Campbell's termination that could have created a basis for retaliation. *See Feist v. La. Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (A plaintiff alleging retaliation may satisfy the causal connection element by showing "[c]lose timing between an employee's protected activity and an adverse action against him").  Campbell has established that, in December 2010 or January 2011, he contacted Atlantic's defense counsel in the ongoing *Gibson* litigation and stated that he may have committed perjury.  It is not clear what Campbell intended to change in his testimony, or what the managers at Atlantic may have thought Campbell would say in a second deposition.  Campbell has testified, however, that he felt uncomfortable about his deposition because he had been instructed to say that he had laid off minority employees, when in fact he had not done so.  He has also asserted that he hesitated to sign a declaration that Atlantic's counsel prepared for him, and that when he approached Chris Scruggs about that declaration, Scruggs told him he needed to "play ball to win at any cost" (Campbell Aff. 6 (¶20), ECF No. 32-1).

Campbell filed his EEOC charge alleging that he had been denied a promotion because of his race on January 19, 2011.  There is no evidence in the record as to when Atlantic became aware of the EEOC charge, but during the next

few days, Campbell also complained about alleged racial discrimination in demotion practices to Human Resources.  The following week, Campbell was suspended, and the meeting between Campbell and Chris Romano on January 27, 2011 took place. Atlantic submits that it terminated Campbell some five days later because of what occurred during that meeting.

Second, while such temporal proximity alone would not be sufficient to establish but-for causation, there is also a factual dispute with respect to what occurred during the meeting between Campbell and Romano on January 27, 2011, which apparently led to Campbell's termination.  Atlantic's stated basis for terminating Campbell rests entirely on the content of that meeting, and it is apparent from the record that Campbell complained about racial discrimination during the meeting.  (Def. Mot. Ex. 14, Romano notes, ECF No. 22-14; Campbell Aff. 11 (¶43), ECF No. 32-1).  Additionally, the record establishes that Chris Romano specifically intended to talk to Campbell about "his report of potential perjury in his prior deposition testimony" in the *Gibson* litigation when he requested the meeting. (Romano Aff. 5 (¶22), ECF No. 22-1).[12]

---

[12] The Court notes that the record does not establish who at Atlantic made the final decision to terminate Campbell.  However, the record indicates that the company's General Counsel was involved in that decision, and that he was aware of the meeting between Romano and Campbell.  (Pl. Ex. G at 1, Tran e-mail, ECF No. 32-7; Romano Aff. 5 (¶23), ECF No. 22-1; Motley Dep. 27:17-25, ECF No. 22-13). *See Manning v. Chevron Chem. Co.*, LLC, 332 F.3d 874, 884 (5th Cir. 2003) (requiring proof that "decisionmakers" for the employer knew about the protected activity).

As the Court has already noted, Campbell's and Romano's accounts of their conversation that evening are entirely different.  Atlantic asserts that Campbell attempted to extort money from Atlantic in exchange for making a number of racially-related complaints or issues "go away;" while Campbell submits that he did not attempt to extort money from Atlantic, but instead Romano "approached [him] over the subject of money," and "repeatedly asked [him] how we were going to make this go away," and offered him a job at a different Atlantic worksite.  (Pl. Resp. Ex. G, Campbell e-mail to Lanusse, ECF No. 32-7; Campbell Aff. 11 (43); Campbell Dep 79:21–80:7, ECF No. 32-2).

If the Court takes Atlantic's version of the conversation between Romano and Campbell that evening as true, then Atlantic has demonstrated a legitimate, nondiscriminatory reason for terminating Campbell.  However, the only evidence in the record of what occurred during this meeting consists of the statements of the two parties involved:  Chris Romano's affidavit, and Campbell's affidavit and deposition testimony.  Given the widely divergent accounts of this conversation, the Court would be required to assess the credibility of these witnesses to make any determination about the sufficiency of the evidence with respect to whether Campbell's complaints of racial discrimination were causally linked to his termination.[13]   Such an assessment would be inappropriate at the summary

---

[13] Similarly, a determination of whether Atlantic's stated basis for terminating Campbell (attempted extortion) was a pretext for retaliation would necessarily involve the facts about the meeting between Romano and Campbell on January 27, 2011.

judgment stage. Given that the meeting between Campbell and Romano appears to be crucial to the decision to terminate him, the Court finds that this factual dispute is material, and precludes summary judgment on the retaliation claim.

### V. Infliction of Emotional Distress & Punitive Damages Claims

Campbell's complaint states a claim of infliction of emotional distress. However, Campbell has not responded to Atlantic's arguments that it is entitled to summary judgment on this claim. Campbell has not pointed to any evidence in support of this claim, and he admitted in his deposition that he has no medical records to support such a claim. (Campbell Dep. 104:17-23, ECF No. 32-2). Given that Campbell has wholly failed to dispute Atlantic's arguments in support of summary judgment on this claim, it is deemed abandoned and will be dismissed.

Likewise, Campbell's complaint states a claim for punitive damages, but Campbell has not responded to Atlantic's arguments that it is entitled to summary judgment on this claim. Nor has Campbell pointed to any evidence in the record to support his allegation that he is entitled to punitive damages. Again, "Rule 56 does not impose upon the district court . . . a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Willis*, 749 F.3d at 317 (citation omitted). Accordingly, this claim is also deemed abandoned and will be dismissed.

### CONCLUSION

For the reasons stated above, Atlantic is entitled to summary judgment on all of Campbell's claims except his Title VII retaliation claim regarding his

termination.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion for Summary Judgment filed by Defendant Atlantic Scaffolding Company, LLC, is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED AND ADJUDGED** this the 13th day of June, 2014.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE